HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BLUETOOTH SIG, INC., a Delaware
corporation,

         Plaintiff,

    v.

FCA US LLC, a Delaware limited liability
company,

         Defendant.

Case No.  2:18-cv-01493-RAJ

ORDER

## I.   INTRODUCTION

Before the Court are three motions.  Having considered the submissions of the parties, the relevant portions of the record, and the applicable law, the Court finds that oral argument is unnecessary.  For the reasons below, Plaintiff's Motion to Exclude the Expert Report and Testimony of Hal Poret (Dkt. # 59) is **DENIED**; Plaintiff's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment (Dkt. # 155) is **GRANTED in part** and **DENIED in part**; and Defendant's Motion to Dismiss on the Ground of *Forum Non Conveniens* and Motion for Summary Judgment or, in the Alternative, to Strike Jury Demand (Dkt. # 150) is **DENIED**.

ORDER – 1

## II.  BACKGROUND

Bluetooth wireless technology enables electronic devices to connect with one another.  *See* Dkt. # 155 at 8-9.  Today, billions of Bluetooth-branded devices fill the market.  *Id.*  Plaintiff Bluetooth SIG, Inc. ("Bluetooth" or the "Bluetooth SIG") owns various trademarks associated with this technology.  *Id.*  Three marks are at issue here: (1) the "BLUETOOTH word mark" (BLUETOOTH, U.S. Reg. No. 2,909,356); (2) the "BLUETOOTH & B Design Mark" (  , U.S. Reg. No. 2,911,905); and (3) the "B Design Mark" (  , U.S. Reg. No. 3,389,311).  *Id.*; Dkt. # 1 at 5-7. Collectively, the three marks are referred to as the "Bluetooth Marks."  As a nonprofit nonstock corporation and owner of the marks, Bluetooth has three purposes: "(1) to develop BLUETOOTH® wireless technology by facilitating collaboration among its members to create new and enhanced technology specifications; (2) to drive the interoperability of BLUETOOTH-enabled devices through a product qualification program that incorporates certain trademark, copyright and patent licenses; and (3) to promote BLUETOOTH wireless technology and the brand."  Dkt. # 155 at 8-9.

Defendant FCA US LLC ("FCA") is an automotive manufacturer that sells vehicles under the Fiat, Chrysler, Dodge, Jeep, and Ram brands.  Dkt. # 150 at 7.  Many of FCA's vehicles are equipped with "Bluetooth-enabled radio head units."  *Id.* at 8. These head units may be paired with other Bluetooth-enabled devices, such as smart phones.  Dkt. # 164 at 2.  Some of FCA's Bluetooth-fitted vehicles feature its "Uconnect" infotainment platform, which allows users to "find vehicles, start cars, search for points of interest, navigate directions, access Wi-Fi, and receive notices of vehicle health and reports."  Dkt. # 53 ¶¶ 36-37.  To advertise the Uconnect system, FCA uses the Bluetooth Marks on its website and on its in-vehicle displays.  Dkt. # 53 ¶ 41.

As the owner of the marks, Bluetooth often grants licenses to other companies, so long as they satisfy several requirements.  Dkt. # 155 at 9.  They must first become a member of the Bluetooth SIG and execute certain membership agreements, including the

ORDER – 2

Bluetooth Trademark License Agreement. *Id.*  They must also use the marks in association with products that have been properly qualified and declared under the Bluetooth Qualification Process ("BQP"). *Id.*

Relevant here is how Bluetooth issues licenses for head units.  Like other automotive manufacturers, FCA obtains head units from third party suppliers.  Dkt. # 150 at 8.  These suppliers develop and manufacture the head units specifically for FCA vehicles. *Id.*  As Bluetooth members, the suppliers test the head units according to the BQP, report the results to Bluetooth, and then receive a Qualified Design ID number and a Declaration ID number. *Id.*; Dkt. # 1 ¶¶ 31-32.  During this process, the suppliers incur administrative fees.  Dkt. # 150 at 8.  After the units have been declared, the suppliers distribute them to FCA for installation. *Id.* at 7.

Bluetooth asserts that, to use its marks, automotive manufacturers must also join the Bluetooth SIG and must also certify and list their end products.  Dkt. # 155 at 10. FCA is not a Bluetooth member and has never filed declarations (Dkt. # 150 at 16 n.11) and as such, Bluetooth says, FCA is "freerid[ing] on the value and recognition" of the Bluetooth Marks (Dkt. # 155 at 10).  FCA argues, however, that it is free to use the marks because the third party suppliers have already qualified and declared the head units and already paid the administrative fees.  Dkt. # 150 at 9-11.  Requiring automotive manufacturers to qualify and declare the head units again, FCA believes, would result in multiple fees for the same unit. *Id.*

Against this backdrop, Bluetooth sued FCA for trademark infringement, asserting seven causes of action.  Dkt. # 1.  FCA answered and counterclaimed, contending that the underlying Bluetooth Marks should be cancelled and that FCA's uses are nominative and fair (among other equitable defenses).  Dkt. # 53.  Both parties moved for summary judgment.  Dkt. ## 150, 155.  Relevant to the cross motions for summary judgment are three of Bluetooth's federal claims (trademark infringement, counterfeiting, and dilution); six of FCA's affirmative defenses (acquiescence, waiver, laches, abandonment,

ORDER – 3

nominative fair use, and the first sale doctrine); and two of FCA's counterclaims (cancellation for trademark abandonment and cancellation for engaging in the production or marketing of goods or services to which a certification mark is applied). *Id.* Both parties also moved to exclude the other's experts. Dkt. ## 57, 59, 151, 152.

Before this Court are the parties' cross motions for summary judgment and Bluetooth's Motion to Exclude the Expert Report and Testimony of Hal Poret. Dkt. ## 59, 150, 155.

### III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

However, the court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to

ORDER – 4

1    wade through and search the entire record for some specific facts that might support the

2    nonmoving party's claim").  The opposing party must present significant and probative

3    evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*,

4    952 F.2d 1551, 1558 (9th Cir. 1991).  Uncorroborated allegations and "self-serving

5    testimony" will not create a genuine issue of material fact.  *Villiarimo v. Aloha Island*

6    *Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. v. Pac Elec. Contractors*

7    *Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

## IV.  DISCUSSION

### A.    Bluetooth's Motion to Exclude Hal Poret's Survey, Report, and Testimony

11    In opposing Bluetooth's motion for summary judgment, FCA relies on a consumer

12    survey conducted by its expert, Hal Poret.  According to the survey, 82% of consumers

13    believe that "Bluetooth" is a generic term.  Dkt. # 94 at 8-9.  FCA uses this evidence to

14    argue, among other things, that Bluetooth's marks have become generic and are subject

15    to cancellation.  Dkt. # 172 at 11-12.  Bluetooth moves to exclude that survey, an

16    accompanying report, and Mr. Poret's testimony.  Dkt. # 59.

17    Mr. Poret conducted a "*Teflon* survey," named after the survey employed in *E. I.*

18    *DuPont de Nemours & Co. v. Yoshida Int'l, Inc*., 393 F. Supp. 502 (E.D.N.Y. 1975).

19    Dkt. # 94 at 6.  The survey teaches respondents the difference between brand names and

20    common names, tests the respondents to ensure they understand the distinction, and then

21    asks them to identify from a list of names which ones are brand names and which are

22    common names.  *Id.*  In that list, are a trademark owner's mark (the test term) and other

23    terms (the control terms).  *Id.* at 7.  Mr. Poret did just that here, asking survey

24    respondents to identify brand names and common names between the following:

25    BLUETOOTH (test term); ASUS, GARMAN, and UNDERWRITERS

26    LABORATORIES (brand names); and GPS, WIRELESS, and SMART LOCK (generic

27    names).  *Id.* at 8.  Of all respondents, 82% believed that BLUETOOTH was a generic

28    ORDER – 5

term.  *Id.* at 8-9.

At bottom, Bluetooth argues that Mr. Poret's survey did not adequately distinguish between trademarks and certification marks.  Dkt. # 59 at 5.  Bluetooth cites what it believes are several errors.  For example, in educating respondents what brand names are, Mr. Poret included definitions for both trademarks and certification marks but "emphasiz[ed] the definition of a trademark over that of a certification mark."  *Id.* at 10.  The survey also did not test the respondents on their understanding of a certification mark.  *Id.* at 12.  And two of the three control terms for brand names were trademarks (ASUS and GARMIN); only one was a certification mark (UNDERWRITERS LABORATORIES).  *Id.* at 13.  In short, Bluetooth believes that the survey was "highly suggestive and leading."  *Id.* at 13-14.

The admissibility of expert opinions is guided by Federal Rule of Evidence 702, which in part states that an expert by "knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  A trial court must ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  The testimony is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline," and it is relevant "if the knowledge underlying it has a valid connection to the pertinent inquiry."  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States v. Sandoval–Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).  "Shaky but admissible evidence" is to be attacked by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not exclusion.  *Daubert*, 509 U.S. at 596.

The Ninth Circuit has long held that survey evidence should be admitted "as long as [it is] conducted according to accepted principles and [is] relevant."  *Fortune*

ORDER – 6

*Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (alterations in original) (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir.1997)).  "Challenges to survey methodology go to the weight given [to] the survey, not its admissibility."  *Wendt*, 125 F.3d at 814.  This includes challenges to "methodology, survey design, reliability, the experience and the reputation of the expert, critique of conclusions, and the like."  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).

Given that Mr. Poret's survey was conducted according to accepted principles and is relevant, the Court will not exclude it or Mr. Poret's accompanying report and testimony.  Mr. Poret conducted a *Teflon*-type survey, the most widely accepted survey format for testing a trademark's genericness.  2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:16 (5th ed.) (hereinafter McCarthy) ("Many courts have admitted into evidence and given weight to a *Teflon*-type survey. A *Teflon*-type survey has become the most accepted and used survey method for determining the generic name-trademark distinction.") (footnote omitted).  And whether the BLUETOOTH word mark has become generic is relevant because generic marks are subject to cancellation at any time.  3 McCarthy § 20:56.  If that is indeed the case, then FCA could not be liable for its use of the word mark.

Bluetooth's critiques fail for at least two reasons.  First, Bluetooth takes issue with Mr. Poret's conflation of trademarks and certification marks—but that is a critique of the *Teflon* survey format itself.  The *Teflon* format does not compare trademarks against certification marks, or even certification marks against common names.  Rather, it compares brand names against common names.  2 McCarthy § 12:16.  Second, Bluetooth's arguments are all directed at the survey's methodology, which go to the survey's impeachability not admissibility.  Bluetooth's main argument is that Mr. Poret's survey was designed to emphasize trademarks over certification marks, causing the survey to be suggestive and misleading.  This is a reason for the survey to be impeached,

ORDER – 7

not excluded.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) (explaining that biased questions go to the weight, and not the admissibility, of a survey).

The *Teflon* format is widely accepted and is thus conducted according to accepted principles, so Mr. Poret's survey is reliable, relevant, and will not be excluded.  For these reasons, Plaintiff's Motion to Exclude the Expert Report and Testimony of Hal Poret is **DENIED**.

### B.    FCA's Motion to Dismiss

Asserting the doctrine of *forum non conveniens*, FCA moves to dismiss Bluetooth's entire action or, at the very least, its damages claim.

#### i.    *Forum Non Conveniens*

Bluetooth's Membership Agreement contains a forum selection clause designating Delaware as the proper forum for any agreement-related disputes.  Dkt. # 158-6 at 108. Under that agreement, FCA says, Washington is an inconvenient forum, and the action must be dismissed or transferred to Delaware.  Dkt. # 150 at 14-17.  But Bluetooth asserts no breach of contract claim, and both FCA and Bluetooth agree that FCA has never entered the Membership Agreement.  *Id.* at 14; Dkt. # 156 at 12.  The Court will not enforce a forum selection clause of an agreement that does not exist.  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) ("[A] *valid* forum-selection clause [should be] given controlling weight in all but the most exceptional cases.") (emphasis added) (second alteration in original).  Thus, the Court denies FCA's motion to dismiss as to *forum non conveniens*.

#### ii.    Bluetooth's Damages Claim

FCA also seeks dismissal of Bluetooth's damages claim.  Bluetooth is seeking lost declaration fees, which FCA contends are contract, not Lanham Act, damages.[1]  Dkt.

---

[1] According to its complaint, Bluetooth also seeks injunctive relief, attorneys' fees, and disgorgement of FCA's profits.  Dkt. # 1 at 21-22.

ORDER – 8

# 189 at 6-8.  FCA reasons that if in fact no contract exists here, then there can be no contract damages.  *Id.*

Under the Lanham Act, a plaintiff may recover, subject to principles of equity, (1) defendant's profits, (2) plaintiff's damages, and (3) costs of the action.  15 U.S.C. § 1117.  In the trademark context, "semantic confusion" abounds because plaintiff's "damages" may refer to many bases of monetary recovery.  5 McCarthy § 30:57.  Indeed, plaintiff's damages may be measured by both plaintiff's actual business damages and its own loss of profits.  *Id.*; *see also id.* § 30:79.

Such confusion found its way here.  Bluetooth hopes to recover, among other things, "lost fees."  Dkt. # 156 at 30.  These would be the fees that FCA would have paid had FCA been a Bluetooth member and had it declared its products.  *Id.*  Bluetooth labels these as "actual damages."  *Id.*

FCA is convinced, however, that Bluetooth "wants to recover contract damages without having to prove the existence of a contract."  Dkt. # 189 at 7 (emphasis omitted).  To support that theory, FCA strings together the following premises: Actual trademark damages may be measured by a plaintiff's direct injury or a plaintiff's lost profits.  *Id.*  Bluetooth is not seeking "lost profits" here; it is seeking "lost declaration fees."  *Id.*  Bluetooth's damages claim must then rest on "direct injury."  *Id.*  But Bluetooth suffered no injury because the fees it charges merely cover the costs of administering declarations; given that FCA did not file any declarations, Bluetooth incurred no costs.  *Id.*  Thus, if Bluetooth hopes to recover "lost declaration fees," it must enforce the Bluetooth Membership Agreement and proceed under contract law.  *See id.*  Eager to put Bluetooth in a bind, FCA reasons that Bluetooth must concede either (a) its theory of "lost declaration fees" is a contractual theory, which would be untenable because no contract exists here, or (b) there is in fact a valid contract, and in which case that contract would mandate dismissal under *forum non conveniens*.  *Id.*; *see supra* Section IV.B.i.

That is a false dilemma.  Dispelling any semantic confusion, the Court finds that

ORDER – 9

Bluetooth's request for "lost declaration fees" is in fact one for "lost profits."  As discussed above, "lost profits" are considered "actual damages" and are thus recoverable under the Lanham Act.  5 McCarthy §§ 30:57, 30:79.  Hence, Bluetooth may indeed recover lost profits without asserting the existence of a contract.  Wary to inject yet another term, the Court sees no difference between Bluetooth's request and a request for a "reasonable royalty," which can be an appropriate measure of damages under the Lanham Act.

Reasonable royalties are the hypothetical licensing royalties that an infringer would have paid to a trademark owner.  *QS Wholesale, Inc. v. World Mktg., Inc.*, No. 8:12-cv-00451-DOC-RNB, 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013) (collecting cases).  They are a way to calculate a trademark owner's lost profits as they focus on the licensing fees that were never paid by an infringer.  *Id.*  In most cases, because they must be proved with reasonable certainty, reasonable royalties are only awarded when the parties had a prior licensing agreement or when the plaintiff had "engaged in the practice of licensing the mark to a third party."  *Id.*

Despite the parties' labels, Bluetooth here is seeking actual damages in the form of lost profits.  The measure of lost profits would be the membership fees or the declaration fees that FCA would have paid had it sought a license.  Because Bluetooth routinely enters such agreements with other automotive manufacturers, it could likely ascertain that amount with reasonable certainty.  Dkt. # 155 at 10; Dkt. # 156 at 29.  Thus, the Court will not dismiss Bluetooth's claim for damages.

FCA raises two objections: Bluetooth is a nonprofit entity (suggesting that it cannot recover lost "profits"), and the licensing agreements are "royalty free" (suggesting that a reasonable royalty would be inappropriate here).  Dkt. # 189 at 7.  This, again, is a matter of semantics.  It is undisputed that Bluetooth generates revenue from its membership and declarations and has done so since at least 2014.  Dkt. # 150 at 10.  In the lost profits context, "profits" may simply mean "revenue."  *Nat'l Grange of the Order*

ORDER – 10

*of Patrons of Husbandry v. California Guild*, 334 F. Supp. 3d 1057, 1069 (E.D. Cal. 2018) (applying the reasonable royalty analysis to non-profit organizations and explaining that "profits" may be interpreted as total revenue). Further, under the case law, a reasonable "royalty" simply means a licensing fee, which Bluetooth clearly charges. *QS Wholesale*, 2013 WL 1953719, at *4.

For these reasons, FCA's motion to dismiss is **DENIED**.

**C.    FCA's Motion to Strike Jury Demand**

Assuming that the Court would dismiss Bluetooth's damages claim, leaving only equitable claims to be tried, FCA moved to strike Bluetooth's jury demand. Dkt. # 150 at 28-29. But Bluetooth's claim for "actual damages" stands. Given that a claim for trademark damages is a legal one, Bluetooth has a constitutional right to a jury trial. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) ("In particular, the Seventh Amendment preserves the right to trial by jury of all legal claims, whereas no right to a jury exists for equitable claims.") (alterations and internal quotations marks omitted); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962) ("[A]n action for damages based upon a charge of trademark infringement [is] no less subject to cognizance by a court of law.").

FCA's motion to strike Bluetooth's jury demand is **DENIED**.

**D.    Trademark Infringement Under 15 U.S.C. § 1114 (Count I)**

Next, Bluetooth moves for summary judgment on its federal trademark infringement claim. Dkt. # 155 at 11-16. FCA opposes and asserts that it engages in nominative fair use of Bluetooth's marks. Dkt. # 172 at 17-19.

To prevail on a claim of trademark infringement, a party must prove: "(1) that it has a protectible ownership interest in [a] mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)). "Because of

ORDER – 11

the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999); *see also Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002) (explaining that district courts may grant summary judgment only if there are no genuine issues of likelihood of confusion and that even then they should do so sparingly).

### i.    Bluetooth's Protectible Ownership Interests in the Marks

FCA argues that Bluetooth lacks protectible ownership rights in the marks, in part, because they are generic and functional.  Dkt. # 172 at 11-12.  Federal trademark law arranges marks on a spectrum of distinctiveness.  *See Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979).  As marks get more distinctive, they receive more protection.  *See id.*  The least distinctive type of mark is a generic mark.  *Id.*  Generic marks are marks that simply name the product or service being offered.  *See id.* ("A 'generic' term is one that refers, or has come to be understood as referring, to the genus of which the particular product or service is a species.").  A generic mark can never be trademarked, and genericness is a sufficient reason to cancel a trademark.  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).  However, a properly registered trademark "is presumed valid, and the burden of proving that the mark is generic rests upon the defendant."  *See Krav Maga Ass'n of Am., Inc. v. Yanilov*, 464 F. Supp. 2d 981, 985 (C.D. Cal. 2006) (citing *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005)).

Over time, a valid trademark may become a "victim of 'genericide.'"  *Elliott v. Google, Inc.*, 860 F.3d 1151, 1155-56 (9th Cir. 2017) (quoting *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007)).  "Genericide occurs when the public appropriates a trademark and uses it as a generic name for particular types of goods or services irrespective of its source."  *Id.* (citing ASPIRIN, CELLOPHANE, and ESCALATOR as examples).  To determine whether a trademark has taken the "fateful

ORDER – 12

step" towards genericness, courts must ask whether the "primary significance of the registered mark to the relevant public" is as the name for a type of good or service, no matter its source. *Id.* This is often called the "who-are-you/what-are-you" test: "If the relevant public primarily understands a mark as describing 'who' a particular good or service is, or where it comes from, then the mark is still valid. But if the relevant public primarily understands a mark as describing 'what' the particular good or service is, then the mark has become generic." *Id.*

Because federally registered trademarks enjoy a strong presumption that they are not generic, a defendant must offer actual evidence that a trademark owner's marks were "used or understood by consumers as a generic term rather than a brand name." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604, 606 (9th Cir. 2005). This could be done by presenting the following: "(1) generic use by competitors of the mark that has not been contested by the owner of the mark; (2) generic use of the trademark by the proponent of the trademark; (3) dictionary definitions to determine public usage; (4) generic usage in the media of the trademark, such as in trade journals and newspapers; (5) testimony of persons in the trade; and (6) consumer surveys." *Calista Enters. Ltd. v. Tenza Trading Ltd.*, 43 F. Supp. 3d 1099, 1116 (D. Or. 2014) (citing *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1150-51 (9th Cir.1999)).

All three Bluetooth Marks are registered and incontestable and are thus entitled to a presumption of validity. Dkt. ## 195-1, 195-2, 195-3; *KP Permanent Make–Up*, 408 F.3d at 604. FCA offers consumer survey evidence showing that one of those marks, the BLUETOOTH word mark, is viewed as a generic term by the consuming public. Dkt. # 172 at 12. According to that survey, only 15.8% of consumers view BLUETOOTH as a brand, while 82% of them view it as a generic term. *Id.* FCA also offers some evidence that Bluetooth employees use the word "Bluetooth" as a noun. *Id.* at 11-12. Bluetooth disagrees with the survey results and argues that the evidence of its employees

ORDER – 13

using the word "Bluetooth" as a noun is meager.  Dkt. # 198 at 7.

FCA argues that the BLUETOOTH word mark is generic; Bluetooth argues that it is not.  This is a clear question of fact.  *KP Permanent Make–Up*, 408 F.3d at 604 (explaining that what evidence must be produced to overcome the presumption of a valid trademark "is generally viewed as an intensely factual issue); *Calista Enterprises Ltd. v. Tenza Trading Ltd.*, 43 F. Supp. 3d 1099, 1116 (D. Or. 2014) ("Whether a mark is generic is a question of fact.").  Although the BLUETOOTH word mark is presumptively valid, FCA has rebutted that presumption with survey evidence and evidence that Bluetooth itself uses the word "Bluetooth" generically.[2]  The Court will not weigh that evidence on summary judgment, so whether the BLUETOOTH word mark is generic poses triable issues of fact.

Besides genericness, FCA argues that Bluetooth's marks are functional, which would be another basis for cancellation.  Dkt. # 172 at 11-12.  There are two steps to the functionality test.  *Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1128 (9th Cir. 2016).  First, courts must determine whether an alleged "significant non-trademark function" is functional in that it is "essential to the use or purpose of the article [or] affects [its] cost or quality."  *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1072 (9th Cir. 2006) (quoting *TrafFix Devices, Inc. v. Marketing Displays*, *Inc.*, 532 U.S. 23, 32-33 (2001)).  Second, if the mark is not functional under the first step, courts must determine whether "protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage."  *Id.*

Without citing the law for functionality, let alone applying it to the facts of this case, FCA argues that the B Design mark should be cancelled because it signals certain functions, such as whether a device is on or off or whether two devices are paired.  Dkt.

---

[2] Mr. Poret's genericness survey assessed whether the BLUETOOTH word mark is generic. Dkt. # 60-1.  It did not evaluate the BLUETOOTH & B Design mark or the B Design mark. Given that those marks are presumptively valid and that FCA has offered no evidence to show that they are generic, the Court holds that these marks are not generic.

ORDER – 14

# 172 at 11-12. But FCA has failed to show that the B Design Mark is essential to wireless connectivity—presumably, devices may pair wirelessly without using the mark—or that the design affects cost or quality. *Au-Tomotive*, 457 F.3d at 1072-73 ("That is to say, Auto Gold's products would still frame license plates and hold keys just as well without the famed marks. Similarly, use of the marks does not alter the cost structure or add to the quality of the products."). And FCA has not shown that trademark protection here would impose a "non-reputation-related competitive disadvantage." *Id.* at 1072. Thus, FCA's functionality argument fails.

In sum, whether the BLUETOOTH word mark is generic poses triable issues of fact. As for the other two marks, FCA has not overcome the presumption of validity.

## ii.    Likelihood of Customer Confusion

When a nominative fair use defense is raised, courts must not use the eight-factor test articulated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir.1979). *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010). Instead, they must use the three-part test set forth in *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir.1992). *Toyota*, 610 F.3d at 1175. In nominative fair use cases, the three-part *New Kids* test better evaluates the likelihood of confusion because when a defendant uses a trademark nominally, the trademark will often be identical to the plaintiff's mark. *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002). Applying the *Sleekcraft* test, "which focuses on the similarity of the mark used by the plaintiff and the defendant, would lead to the incorrect conclusion that virtually all nominative uses are confusing." *Id.*

Bluetooth chiefly applies the *Sleekcraft* test, but FCA asserts a nominative fair use defense and applies the *New Kids* test. The Court agrees with FCA that *New Kids* governs the analysis here. When FCA uses Bluetooth's marks, it does so to refer to the head units in its vehicles, which are indeed Bluetooth-enabled products. Dkt. # 150 at 20. FCA is using Bluetooth's marks to describe Bluetooth's products, even though FCA's

ORDER – 15

"ultimate goal is to describe [its] own product."  *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) (emphasis omitted).  Thus, nominative fair use applies.

The *New Kids* test has three requirements: (1) the product or service in question must not be readily identifiable without use of the trademark; (2) only so much of the marks may be used as is reasonably necessary to identify the product or service; and (3) the user must not suggest sponsorship or endorsement by the trademark holder.  *New Kids*, 971 F.2d at 308.  Though nominative fair use is sometimes mistakenly referred to as an "affirmative defense," it is not one.  4 McCarthy § 23:11.  Rather, it is an "alternative multi-factor test" to assess the likelihood of confusion, and thus the burden of proof remains with the plaintiff.  *Id.*

On the first prong, FCA argues that it would struggle to describe the Bluetooth compatibility of its head units without using the word "Bluetooth" or the B Design.  Dkt. # 150 at 21.  Bluetooth says that there are many available substitutes on hand.  Dkt. # 155 at 15.  These include "wireless smartphone technology" and "wireless smartphone connectivity," both of which Bluetooth argues readily identify the goods.  *Id.*

The Court sides with FCA on prong one.  The standard here is not whether it is in fact possible to imagine different descriptions for a good or service.  For example, in *New Kids*, the Ninth Circuit conceded that one could refer to "the two-time world champions" (at the time) or "the professional basketball team from Chicago" but that it would be far simpler, and more likely to be understood, to refer to the Chicago Bulls.  *New Kids*, 971 F.2d at 306.

Of course, it is possible to refer to Bluetooth technology as "wireless smartphone technology" or "wireless smartphone connectivity" as Bluetooth suggests, but it would be impractical and ineffectual to do so.  First, FCA introduces undisputed testimony that when one pairs an electronic device to a Bluetooth-capable vehicle, the device will say that it is "Bluetooth enabled" not "wireless."  Dkt. # 172 at 17.  Bluetooth's proposed substitutes would thus be imprecise.  Second, it is not clear to the Court how many types

ORDER – 16

of connectivity mechanisms exist.  In *New Kids*, for example, reference to "a large automobile manufacturer based in Michigan" could apply to any of the "Big Three." *New Kids*, 971 F.2d at 306-07.  If Bluetooth connectivity is one of many types of connectivity, then Bluetooth's proposed substitutes would again be imprecise.  If there is in fact only one type of connectivity, then "wireless smartphone technology" and "wireless smartphone connectivity" suffer from the same problems as "the professional basketball team from Chicago."  *Id.*  The precedent is clear that the law has "never adopted such a draconian definition of necessity."  *Toyota*, 610 F.3d at 1180.

The second *New Kids* prong raises fact-intensive questions unfit for summary judgment.  Under the second prong, courts must determine whether an alleged trademark infringer used "only so much of the mark or marks . . . as is reasonably necessary to identify the product or service."  *New Kids*, 971 F.2d at 308.  Bluetooth argues that FCA used the Bluetooth marks "repeatedly" in its advertisements.  Dkt. # 155 at 16.  On the other hand, FCA argues that these repeated uses were not "prominent" as they were "inconspicuous and purely informational."  Dkt. # 172 at 18.  Whether "repeated" but "inconspicuous" uses amount to customer confusion is best left to a trier of fact as reasonable minds may disagree.

The same is true for the third prong.  Whether a defendant "falsely suggested [it] was sponsored or endorsed by the trademark holder . . . speaks directly to the risk of [customer] confusion."  *New Kids*, 971 F.2d at 308.  Like the second prong, whether FCA's uses, in total, signal to customers that FCA is sponsored or endorsed by Bluetooth is for the trier of fact to decide.  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th Cir. 2005) ("Due to the factual nature of likelihood of confusion, determining whether a likelihood of confusion exists at the summary judgment stage is generally disfavored because a full record is usually required to fully assess the facts.").

The Court concludes that the *New Kids* factors govern the infringement analysis

ORDER – 17

1    and that the first prong favors FCA.  The remaining two prongs, however, pose genuine

2    issues of fact.  Thus, the parties' motions for summary judgment on trademark

3    infringement and nominative fair use are **DENIED**.

4         **E.    Counterfeit Trademark Infringement Under 15 U.S.C. § 1114**

5              **(Count II)**

6         Both parties also move for summary judgment on Bluetooth's counterfeiting

7    claim.  To claim statutory damages[3] under 15 U.S.C. § 1117(c), a plaintiff must prove

8    that (1) a defendant intentionally used a counterfeit mark in commerce; (2) knowing the

9    mark was counterfeit; (3) in connection with the sale, offering for sale, or distribution of

10   goods; and (4) defendant's use was likely to confuse or deceive.  *State of Idaho Potato*

11   *Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005).  A mark

12   is a "counterfeit" if it meets the following criteria: it was a nongenuine mark identical to

13   plaintiff's mark, it was registered on the Principal Register for use on the same goods to

14   which defendant applied the mark, it was in use, and defendant was not authorized to use

15   the mark.  *Id.*

16        Bluetooth did not authorize FCA to use its marks, so any use of the mark was a

17   counterfeit.  The actual head units here are no doubt genuine in that FCA sources them

18   from third party suppliers that have tested and declared the units with Bluetooth.  Dkt.

19   # 150 at 8-9.  But when FCA installs the units in its vehicles, advertises features of the

20   vehicles using Bluetooth's marks, and sells the vehicles containing the units, all without

21   obtaining Bluetooth's authorization, FCA is engaged in counterfeiting as defined by the

22   Lanham Act.  Dkt. # 156 at 14; *G & T Terminal Packaging, Inc.*, 425 F.3d at 721.

23        This conclusion is compelled by the Ninth Circuit's decision in *State of Idaho*

24   *Potato Comm'n v. G & T Terminal Packaging, Inc.*  In that case, the Idaho Potato

25

26   [3] Bluetooth also seeks injunctive relief, attorneys' fees, actual damages, and disgorgement
27   of FCA's profits.  The Court has found no case engaging in a separate analysis for these
     other forms of relief and will proceed under the analysis discussed here.
28   ORDER – 18

Commission ("Commission"), a state agency, promoted Idaho potatoes by licensing certification marks, such as "Idaho" and "Grown in Idaho." *G & T Terminal Packaging, Inc.*, 425 F.3d at 711.  G & T Terminal Packaging ("G & T") was a wholesale distributor of Idaho potatoes and a previous licensee of the Commission.  *Id.*  After its license expired, G & T purchased bags branded with the Commission's certification mark and used the bags to package its potatoes.  *Id.* at 712.  The district court granted the Commission's counterfeiting claim.  *Id.*  G & T, much like FCA here, conceded that it was using the Commission's marks without a license.  *Id.* at 721.  It argued, however, that there was no likelihood of confusion because the marked bags, in fact, contained genuine Idaho potatoes.  *Id.*  Indeed, it procured the potatoes from licensed distributors.  *Id.* at 721-22.

The Ninth Circuit rejected that argument and affirmed the lower court's counterfeiting award.  *Id.* at 722.  It held that, although the potatoes were in fact sourced from licensed distributors, by using the Commission's marks without its authorization, G & T "depriv[ed] [the Commission] of the *opportunity* to monitor and control quality."  *Id.* at 722 (emphasis added).

The parties here make nearly identical arguments.  FCA contends that, despite its unauthorized use of the Bluetooth Marks, the head units in its vehicles are genuine and were supplied by licensed third parties.  Dkt. # 150 at 8-9.  Bluetooth claims, however, that it has not authorized FCA to use its marks and that it is unable to monitor the head units once they are installed.  Dkt. # 155 at 23; Dkt. # 156 at 16-17; Dkt. # 198 at 9-10.  This prevents Bluetooth from ensuring that the units properly communicate with the rest of the technology in the vehicle.  Dkt. # 155 at 23.  Under *G & T Terminal Packaging*, Bluetooth's argument, like the Commission's, prevails.

That said, Bluetooth must still show a likelihood of confusion, which as discussed above poses triable issues of fact.  *See supra* Section IV.D.ii.  Of course, some courts have held that "counterfeit" marks are presumptively confusing.  *See, e.g.*, *Coach, Inc. v.*

ORDER – 19

*Pegasus Theater Shops*, No. 2:12-cv-01631-MJP, 2013 WL 5406220, at *3 (W.D. Wash. Sept. 25, 2013) (collecting cases and applying counterfeiting analysis to fake Coach goods); *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1070-71, 1073 (C.D. Cal. 2004) (fake Marlboro cigarettes); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287-90 (S.D.N.Y. 2003) (fake Gucci goods).  But those cases mostly concerned fake consumer goods, unlike the certified head units here.  The Court will not apply that presumption, and Bluetooth must show a likelihood of confusion.

For these reasons, the parties' motions for summary judgment on Bluetooth's counterfeiting claim are **DENIED**.

### F.   Trademark Dilution Under 15 U.S.C. § 1124(C) (Count IV)

Bluetooth next moves for summary judgment on its claim for trademark dilution. To prevail on a trademark dilution claim under the Trademark Dilution Revision Act ("TDRA") of 2006, 15 U.S.C. § 1125(c), "a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment."  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).

Under the TDRA, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the marks owner." 15 U.S.C. § 1125(c)(2)(A).  To determine the requisite degree of fame, a court may consider all relevant factors including (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume and geographic extent of sales or goods; (iii) the extent of the mark's actual recognition; (iv) whether the mark is registered.  *Id.*

Dilution fame is difficult to prove, and Bluetooth falls far short.  Bluetooth claims that its marks are famous and widely recognized, but, as FCA observes, offers almost no

evidentiary support.  What it does offer is a single declaration saying that it has spent over $43 million to promote its brand and that over 32 billion products are shipped globally under its marks.  Dkt. # 155 at 18.  It does not explain how these figures bear on its fame.  Nor does it offer any evidence, such as surveys, demonstrating actual brand recognition.  *See Govino, LLC v. Goverre, Inc.*, No. 8:17-CV-01237-JLS-E, 2018 WL 7348849, at *5 (C.D. Cal. Nov. 20, 2018) ("Although evidence of marketing attempts to increase a mark's profile can be considered in a factual determination of famousness, . . . courts accord it far less weight than evidence of actual ubiquity in the national consciousness. Courts reason that such fame is better demonstrated by sales figures . . . or consumer surveys in which respondents directly attest to recognition of the mark.").

Without more, a reasonable trier of fact could conclude that Bluetooth is not famous.  *See, e.g.*, *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004) ("[T]he FTDA extends dilution protection only to those whose mark is a 'household name.'"); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012) ("It is well-established that dilution fame is difficult to prove."); 4 McCarthy § 24:104 ("By definition, all 'trademarks' are 'distinctive'—very few are 'famous.'").

Because Bluetooth has failed to show that its marks are famous, the Court will not address the remaining elements.  Bluetooth's motion for summary judgment on this claim is **DENIED**.

### G.    Affirmative Defense—First Sale

The parties also move for summary judgment on FCA's affirmative defenses, including first sale, abandonment through naked licensing, and laches.  The Court will address each in turn.

A trademark owner cannot control the distribution of its products beyond the "first sale."  *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998).  Under

ORDER – 21

the "first sale" doctrine, it is neither trademark infringement nor unfair competition for a purchaser of an original article to resell the article under the producer's trademark. *Id.* "It is the essence of the 'first sale' doctrine that a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995) (per curiam).

Bluetooth does not sell head units; FCA does not "resell" head units; the "first sale" doctrine does not apply. Bluetooth does not manufacture and sell head units. Rather, it grants licenses to the third party suppliers that do. Dkt. # 150 at 8-9. Thus, Bluetooth is not a "producer" under the "first sale" doctrine. *Sebastian*, 53 F.3d at 1076.

What is more, FCA does not "resell" head units—it manufactures and sells automobiles Dkt. # 150 at 7. There is no evidence that FCA buys head units from third party suppliers and resells them to customers, separate and apart from its automobiles. And FCA does not claim that it does. Instead, FCA buys head units, installs them in its automobiles, and sells the automobiles. *Id.* at 7-9.

This far exceeds the "stock[ing], display[ing], and resell[ing] a producer's product" described in the case law. *Sebastian*, 53 F.3d at 1076. For example, the Ninth Circuit applied the "first sale" doctrine in favor of Longs Drugs when it simply bought and resold hair care products bearing a licensed trademark. *Sebastian*, 53 F.3d at 1074, 1076-77. Other courts have followed suit. *See, e.g.*, *Upper Deck Authenticated, Ltd. v. CPG Direct*, 971 F. Supp. 1337, 1341 (S.D. Cal. 1997) (applying the "first sale" doctrine to the mere buying and selling of autographed sports memorabilia); *Garmon Corp. v. HealthyPets, Inc.*, No. 5:18-cv-00809-ODW-SHK, 2019 WL 2145455, at *1 (C.D. Cal. May 16, 2019) (applying the "first sale" doctrine to the unauthorized online reselling of pet products).

The Court acknowledges that the Ninth Circuit, in dictum, cited "[a] number of district courts [that] have applied the 'first sale' doctrine in cases where the defendants

ORDER – 22

incorporated the trademarked product into a new product." *Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1137 (9th Cir. 2010).  FCA relies on a few of those cited decisions, Dkt. # 150 at 19-20, and even advances a novel theory that the head units are "component ingredient[s] of a composite product," Dkt. # 189 at 10 (alteration in original).  But the Ninth Circuit did not adopt those decisions, nor did it reconcile them with its previous holdings.  *See Au-Tomotive Gold*, 603 F.3d at 1137.  And FCA borrows its component-ingredient theory from an unpublished trial court decision from another circuit.  This Court will not tread on such shaky ground.

Because the "first sale" doctrine does not apply here, the Court will not address the parties' material alteration arguments.  As to FCA's "first sale" affirmative defense, Bluetooth's motion for summary judgment is **GRANTED**, and FCA's motion is **DENIED**.

## H.    Affirmative Defense & FCA's Second Counterclaim—Abandonment Through Naked Licensing

FCA claims that Bluetooth engages in "naked licensing" and has thereby abandoned its trademark rights.  Dkt. # 53 at 22, 32-33.  To that end, it asserts both an affirmative defense and a counterclaim of abandonment through naked licensing.  *Id.* Bluetooth moves for summary judgment on both.  Dkt. # 155 at 24-28.

A trademark owner must control the quality of its trademarks. *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010) (citing 3 McCarthy § 18:48).  The owner may grant licenses and receive trademark protection only if it maintains "quality control of the goods and services sold under the trademark by the licensee."  *Id.* (quoting *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 595-96 (9th Cir. 2002)).  The owner must play a "meaningful role in holding [its products] to a standard of quality."  *Barcamerica*, 289 F.3d at 598.

If a trademark owner fails to exercise "adequate quality control" over its licensees, it engages in "naked licensing."  *FreecycleSunnyvale*, 626 F.3d at 515-16.  This practice

ORDER – 23

is inherently deceptive, and a court may find that the owner "has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Id.* (internal quotation marks omitted).  Because the result would be involuntary forfeiture of a mark, the proponent of a naked license theory faces a "stringent standard of proof." *Id.*

To determine if a trademark owner exercised adequate quality control, a court must determine whether (1) there was a license containing an express contractual right to inspect a licensee's operations and (2) the owner exercised actual control through inspection or supervision. *Id.* at 516-17.

### i.   Bluetooth's licensing agreement contains a contractual right to inspect

Before becoming a Bluetooth member, a company must execute membership agreements, such as the Bluetooth Trademark License Agreement.  Dkt. # 155 at 9. Under § 5.3 of the agreement, Bluetooth may inspect a licensee's Bluetooth-enabled products and any services identified by Bluetooth's trademarks.  Dkt. # 194-5 at 5.  Thus, a contractual right to inspect exists here, and this factor weighs against a finding of naked licensing.  *FreecycleSunnyvale*, 626 F.3d at 516.

### ii.   Bluetooth exerts actual quality control over its trademarks generally

In general, the measures that Bluetooth takes to protect its brand and the quality of goods bearing its marks are impressive.  Dkt. # 155 at 26-28.  To name a few, Bluetooth registers its marks with custom authorities to combat counterfeiting, trains members on proper brand usage, enlists third parties to publish guidance on proper usage, and monitors and resolves brand enforcement issues.  *Id.*  It also conducts industry-wide audits to ensure compliance with its Bluetooth Qualification Process and monitors and resolves qualification enforcement issues.  *Id.*

These measures are like those taken in *Monster, Inc. v. Dolby Labs. Licensing*

ORDER – 24

*Corp.*, 920 F. Supp. 2d 1066, 1077-78 (N.D. Cal. 2013).  There, the court found that a trademark owner had exercised adequate control over its trademarks—the owner required licensees to abide by the owner's technology guidelines as well as its trademark use and display guidelines, it employed a monitoring program to identify similar and potentially confusing marks, it partnered with customs officials, and it engaged in enforcement efforts when it found unauthorized uses of its marks.  *Monster*, 920 F. Supp. 2d at 1077.  Like the *Monster* court, this Court deems Bluetooth's quality controls sufficient.

FCA, however, is unsatisfied.  It cites deficiencies in Bluetooth's production of its records, arguing that the records are missing years' worth of data. Dkt. # 172 at 29.  Yet FCA does not argue that Bluetooth failed to control the quality of its marks during those gap years.  *See id.*  And FCA otherwise says nothing of Bluetooth's other quality controls and does not provide any countervailing evidence of its own.  *See id.*

Perfection, or even proficiency, is not the standard.  *Monster*, 920 F. Supp. 2d at 1078 (holding that "lapses or exceptions" in a trademark owners' policing of its trademark and product quality did not amount to naked licensing); 3 McCarthy § 18:58 ("To use an academic metaphor, a quality control program need only receiving a passing grade of 'C.' An 'A' is not needed.").  FCA's arguments fail to raise a triable issue of fact, especially given the strong showing that it must make to support its claim.

Because FCA, as the non-moving party, will bear the burden at trial, Bluetooth, as the moving party, may prevail by showing an absence of evidence to support FCA's case, which it has.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to FCA to set forth specific facts showing that there is a genuine issue of fact for trial, which it has not.[4]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

---

[4] FCA argues that a consumer survey conducted by its expert, Hal Poret, shows that the BLUETOOTH word mark has become generic and has therefore lost its significance as a mark, which is grounds for abandonment. Dkt. # 172 at 28.  The survey does not change the analysis.  Abandonment through naked licensing requires that a loss in the significance of a mark be caused by an "act or omission by the trademark owner." 3 McCarthy § 18:48 (citing 15 U.S.C. § 1127).  Mr. Poret's survey did not explain why the

ORDER – 25

Thus, as a matter of law, FCA is not entitled to the complete cancellation of Bluetooth's marks under a theory of abandonment through naked licensing.

### iii. FCA raises triable issues of fact that Bluetooth engages in naked licensing in the automotive industry

The Court is convinced that Bluetooth, in general, does not engage in the naked licensing of its marks. But FCA introduces evidence that Bluetooth engages in naked licensing in the automotive industry. 3 McCarthy § 18:48 ("A number of courts have held that a finding of uncontrolled licensing should not work a total abandonment of the mark, but a forfeiture of mark rights only in those geographic and product markets where use of the mark has not been adequately controlled.").

According to FCA, Bluetooth's licensing in the automotive industry is pretextual. Before automotive manufacturers receive their head units from third party suppliers, the head units have already been tested under Bluetooth's qualification process and declared. Dkt. # 150 at 8-9. The head units are then installed and declared again without any additional testing. Dkt. # 167 at 12. And, in some instances, the third party suppliers simply transfer their declarations to the manufacturers. Dkt. # 158-1 at 68-70; Dkt. # 158-3 at 124-26; Dkt. # 158-8 at 190-93. This shows that Bluetooth lacks actual quality control over its marks in the automotive industry and is thus evidence of naked licensing. This is enough to raise a genuine, triable issue of fact.

To the extent that FCA seeks total cancellation of Bluetooth's marks based on abandonment, Bluetooth's motion for summary judgment is **GRANTED**. To the extent that FCA seeks cancellation in only the automotive industry, Bluetooth's motion is **DENIED**.

### I. Affirmative Defense—Laches

Claiming that Bluetooth should have brought this action long ago and that its

---

mark has supposedly become generic, let alone attribute the mark's genericness to Bluetooth's actions or omissions, so it is immaterial here.

ORDER – 26

unreasonable delay has caused prejudice, FCA asserts the affirmative defense of laches. Dkt. # 53 at 22.  Both parties now move for summary judgment on this defense.

The affirmative defense of laches "is an equitable time limitation on a party's right to bring suit, which is derived from the maxim that those who sleep on their rights, lose them." *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1115 (9th Cir. 2018) (quoting *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (per curiam)).  The application of laches requires a close evaluation of all the facts in a case and is "seldom susceptible of resolution by summary judgment." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) (per curiam).

"The test for laches is two-fold: first, was the plaintiff's delay in bringing suit unreasonable? Second, was the defendant prejudiced by the delay?" *Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 990 (9th Cir. 2009).  Before answering those questions, a court must determine whether a plaintiff timely brought suit. *Id.*

As an equitable defense, laches is distinct from the statute of limitations, "a creature of law." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835-36 (9th Cir. 2002).  The two are related, however, in that to determine laches, courts look to the limitation period for the analogous state law action.  *Id.*  If a plaintiff filed suit within the analogous limitations period, courts strongly presume that laches is inapplicable.  *Id.* If not, then they presume that laches is applicable.  *Id.*

Here, the most analogous limitation period is Washington's three-year statute of limitation for trade name infringement.  *Eat Right Foods*, 880 F.3d at 1115 (citing Wash. Rev. Code Ann. § 4.16.080(2)).

i.    **Because Bluetooth brought this suit outside the analogous statute of limitation period, laches presumptively applies**

Before determining whether a delay was reasonable, a court must measure how long the delay was.  *Eat Right Foods*, 880 F.3d at 1116.  A court starts the clock when a

ORDER – 27

plaintiff knew or should have known of the allegedly infringing conduct and stops it when the plaintiff files a lawsuit.  *Id.*

Bluetooth filed suit on October 11, 2018.  Dkt. # 1.  If it knew or should have known of FCA's alleged infringement before October 2015, then the presumption is that laches applies.  *Eat Right Foods*, 880 F.3d at 1116.  Of course, the parties disagree when exactly Bluetooth knew or should have known of FCA's alleged infringing conduct. FCA believes the clock started in the early 2000s; Bluetooth believes that it started sometime after late 2014.

FCA claims that the clock started as far back as 2002.  It argues that Bluetooth had constructive knowledge long ago, sometime in 2002 to 2003, when news broke that the 2004 Chrysler Pacifica would be one of the first vehicles equipped with Bluetooth technology.  Dkt. # 150 at 12.  If the clock did not start then, then it started four years later, FCA says, when Bluetooth gained actual knowledge because Bluetooth's chief executive officer at the time, Michael Foley, bought a Jeep vehicle equipped with Bluetooth technology.  *Id.*  Finally, in 2010, Bluetooth warned FCA that it needed to declare its vehicles as an "end product listing."  *Id.*

Bluetooth rejects those time markers and says the clock started sometime after FCA was formed in 2014.  The legal entity that is FCA is a result of a 2014 merger between Chrysler Group, LLC ("Chrysler") and Fiat Group.  Dkt. # 155 at 29-30. Bluetooth argues that FCA may not "tack[] on" Chrysler's use of the marks because FCA has failed to show privity with Chrysler.  Dkt. # 156 at 21 n.26.  Any attempts to start the clock before 2014, Bluetooth says, must fail because FCA did not exist before then.  *Id.* at 21.  It further explains that during the four years between FCA's formation and the filing of this suit, FCA behaved as if it were a Bluetooth member, leading Bluetooth to believe that it indeed was one.  *Id.*  Thus, Bluetooth suggests that there was no delay and argues that if there were, the delay was reasonable.  Dkt. # 155 at 30.

The undisputed facts reveal that Bluetooth knew or should have known of FCA's

ORDER – 28

infringement in as early as 2010, more than eight years before filing this lawsuit and well outside the applicable three-year statute of limitation.  Thus, laches presumptively applies.

This is clear from Bluetooth's own account.  According to Bluetooth, in 1998, two automobile manufacturers, Daimler-Benz and Chrysler Corporation, merged to form DaimlerChrysler AG.  Dkt. # 156 at 21.  The new entity joined the Bluetooth group and registered its products.  *Id.*  About a decade later, the entity split into Daimler AG ("Daimler") and Chrysler Group, LLC.  *Id.*  Daimler remained a member of the Bluetooth SIG, but Chrysler did not.  *Id.* at 22.

In early 2010, Bluetooth became aware of the split and instructed Chrysler to register as a member and register its products.  *Id.* at 22.  On February 25, 2010, a member of Bluetooth's enforcement team notified Chrysler:

> We need Chrysler LLC to register for membership within the Bluetooth SIG (which is free) in order to create End Product Listings for the vehicles you currently sell that come equipped with Bluetooth technology.  In order to sell Bluetooth enabled products – a company must be a member of the Bluetooth SIG and the products must be qualified.  Can you please advise on the state of the Qualification of the [sic] all of your Bluetooth enabled vehicle models?

Dkt. # 186-8 at 4-5.  Weeks later, the same enforcement team member notified Chrysler again that it had not registered with the Bluetooth SIG and that she "ha[d] been trying to get [Chrysler] to register, as [it] do[es] have Bluetooth enabled items and as such [it] do[es] need to be a member in order to be properly licensed to use the trademarks, etc."  Dkt. # 186-9 at 2.

That is just the evidence under Bluetooth's retelling; FCA introduces more undisputed evidence of the same.  For example, on March 15, 2010, Bluetooth's Qualification Enforcement Program Manager e-mailed Chrysler saying, "Thank you for becoming a Bluetooth SIG member. . . . We could not find your product(s)' [End Product Listing] in our listing database . . . . The [End Product

ORDER – 29

Listing] is mandatory according to the current Qualification Program Reference Document (PRD) for all products implementing Bluetooth wireless technology." Dkt. # 158-4 at 92 (listing Bluetooth-compatible vehicle models under Chrysler, Dodge, and Jeep brands). Also, an entry in a 2010 Bluetooth spreadsheet notes, regarding Chrysler, "In communication, awaiting response to begin [End Product Listing] process." Dkt. # 158-3 at 20; Dkt. # 158-4 at 107.

Thus, in early 2010, Bluetooth knew the following: Chrysler was installing Bluetooth-enabled head units in its vehicles; Chrysler was not a registered member of the Bluetooth group; and Chrysler did not declare its products with Bluetooth. It even notified Chrysler of these deficiencies. No reasonable trier of fact could dispute that Bluetooth knew or should have known about Chrysler's alleged infringement following this correspondence.

But Bluetooth did not file this lawsuit until late 2018, more than eight years later. Trying to justify the delay, Bluetooth says that, from early 2010 until late 2017 when FCA formally disclaimed any obligation to seek a license, Chrysler and FCA were in fact Bluetooth members or, "at the very least, affirmatively represented" that they were. Dkt. # 156 at 22. Lacking evidence of actual membership registration or product declarations, Bluetooth cites a few interactions: Chrysler and Bluetooth communicated about the qualification of Chrysler's products; Chrysler received Bluetooth emails directed exclusively to Bluetooth members; and Chrysler representatives attended members-only events. *Id.* at 22-23. FCA employees also received members-only e-mails, attended members-only events, and supposedly "clicked through" membership agreements.[5] *Id.*

This is of no moment. Membership alone would not have authorized Chrysler and FCA to use the marks. To receive a Bluetooth license, Chrysler would have had to indeed register as a Bluetooth member, but it would have also had to "create End Product

---

[5] Although Bluetooth cites several exhibits, those exhibits do not show that FCA employees clicked through Bluetooth's membership agreements.

ORDER – 30

Listings for the vehicles [it] currently sell[s]" and "the products must be qualified." Dkt. # 186-8 at 4-5. Even if, Chrysler and FCA held themselves out as members, they would still have had to declare their products,[6] which they did not.

Since as early as 2010, Bluetooth knew or should have known that Chrysler did not declare its products. First, based on the enforcement e-mails, Bluetooth knew of the licensing requirements and knew that Chrysler fell short on two fronts, the membership front and the product declaration front. Even if Bluetooth believed that Chrysler became a Bluetooth member sometime later, that would not itself justify a belief that Chrysler declared its products. Second, Bluetooth has a robust enforcement program, which identifies brand and qualification issues of just this sort and resolves them. *See supra* Section IV.H.ii. This makes it even more unreasonable for Bluetooth to claim that it did not know about Chrysler and FCA's lack of product declarations for eight years. Taken at their best, Chrysler and FCA's receipt of members-only emails and attendance of members-only events do not give rise to the reasonable belief that Chrysler or FCA declared or qualified their products. Therefore, Bluetooth's reliance on various "affirmative representations" of membership from 2010 to 2018 was not reasonable.

Also unconvincing is Bluetooth's argument that FCA may not "tack[] on" Chrysler's use of the marks for purposes of laches, unless FCA proves that FCA and Chrysler are in privity. Dkt. # 156 at 21 n.26. "The application of the defense of laches is committed to the sound discretion of the district court." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992), *abrogated on other grounds by SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954 (U.S. 2017). As an equitable doctrine, laches is not applied using "mechanical rules." *Id.*

---

[6] As FCA observes, the Bluetooth Qualification Process has changed over time. Dkt. # 150 at 8 n.4. The declarations have been variously called "End Product Listing," "Qualified Design Listing," "Declaration ID" number, and "Qualified Design ID" number. *Id.* The Court refers to the declaration process generically, unless otherwise specified.

ORDER – 31

1  (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)).  A court must look at all the

2  "particular facts and circumstances" and "weigh the equities of the parties."  *Id.*

3         Here, Bluetooth tries to use a legal distinction (that Chrysler and FCA are distinct

4  corporate entities) to defeat laches (an equitable defense).  It does not prevail.

5  Bluetooth's entire claim for trademark infringement is predicated on FCA's unauthorized

6  use of Bluetooth's trademarks to promote Chrysler, Jeep, Dodge, Ram, and Fiat brand

7  automobiles.  Dkt. # 1.  Bluetooth does not dispute that FCA in fact owns those brands

8  today.  Dkt. # 155 at 29-30.  And it does not dispute FCA's evidence that Chrysler

9  Group, LLC (now known as FCA US LLC) has owned those brands since 2009.  Dkt.

10  # 180 at 1-3.  Finally, it does not explain why a merger between Chrysler and Fiat Group

11  in 2014 would affect Bluetooth's actual or constructive knowledge of Chrysler's past

12  infringement.  Dkt. # 155 at 29-30.

13         Thus, weighing the facts and circumstances, the Court finds that FCA may "tack

14  on" Chrysler's use of Bluetooth's trademarks for purposes of laches.  *See, e.g.*, *Reese v.*

15  *AT & T Mobility II, LLC*, No. 2:13-cv-05198-ODW-PLA, 2014 WL 1873046, at *5 (C.D.

16  Cal. May 9, 2014) ("So long as the corporate name change did not have the effect of

17  concealing the entity's identity—such that [plaintiff] was impeded from bringing suit-

18  there is no principled reason to refuse to allow AT & T to assert Cingular's laches

19  defense. To hold otherwise to [sic] would be to exalt form over substance.") (citation

20  omitted); *Enel Co., LLC v. Schaefer*, No. 12-CV-1369-IEG WMC, 2013 WL 5727421, at

21  *4 (S.D. Cal. Oct. 22, 2013) (collecting cases and finding that "the Federal Circuit did not

22  explicitly or implicitly narrowly define a successor or privity in the manner that Plaintiffs

23  suggest").

24         Without fixing an exact date, the Court finds as a matter of law that Bluetooth

25  knew or should have known of FCA's alleged infringing activities as early as 2010.  As

26  this was long before Bluetooth brought suit in 2018 and well outside the analogous

27  statute of limitation, the Court presumes that laches applies.

28  ORDER – 32

1

               **ii.**      **Bluetooth's delay was not reasonable**

2          Bluetooth may rebut the presumption that laches applies if it can show that its

3 delay was reasonable.  For obvious reasons, much of the analysis above applies here as

4 well.  (When Bluetooth should have known about FCA's alleged infringement is

5 ultimately a question of when a reasonable person would have known.)

6          That aside, to assess unreasonable delay, courts in the Ninth Circuit analyze the

7 six factors in *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).  These

8 include the strength and value of trademark rights asserted; plaintiff's diligence in

9 enforcing a mark; harm to a senior user if relief is denied; good faith ignorance by junior

10 user; competition between a senior and junior user; and the extent of harm suffered by

11 junior user because of senior user's delay.  *Id.*

12          One factor, competition between a junior and senior user, is neutral.  FCA and

13 Bluetooth do not compete with one another.

14          Two factors favor Bluetooth.  First, for purposes of laches, the Bluetooth Marks

15 are strong.  They are federally registered and thus presumptively valid, and Bluetooth has

16 offered evidence of their conceptual and commercial strength.  Dkt. # 155 at 13

17 (explaining conceptual strength because "Bluetooth" is a "coined term and the B Design

18 mark lacks any inherent meaning); Dkt. # 198 at 12 (explaining commercial strength by

19 citing "over 35,000 licensees and billions of products" on the world market).  Of course,

20 FCA argues that one of the marks is generic.  Dkt. # 172 at 11-12.  On balance, however,

21 this factor tips in Bluetooth's favor.  Second, Bluetooth has claimed some harm here,

22 specifically that if it does not receive relief, then FCA will be allowed to "freeride on the

23 value and recognition" of the Bluetooth Marks.  Dkt. # 155 at 10.  Given that Bluetooth

24 provides no evidence, this factor only slightly favors Bluetooth.

25          Two factors greatly favor FCA.  Bluetooth has not been diligent in enforcing its

26 mark, which has led to FCA's good faith ignorance.  As discussed above, FCA has

27 incorporated Bluetooth technology since as early as 2003.  Dkt. # 150 at 24.  Since at

28 ORDER – 33

least 2010, Bluetooth knew or should have known that FCA was not a Bluetooth member and did not declare or qualify its products.  Dkt. # 156 at 22-23.  Yet Bluetooth did not file a lawsuit until 2018, more than eight years later.  Dkt. # 1.  Even assuming FCA held itself out as a Bluetooth member in that intervening period, that would not justify Bluetooth's delay because membership alone would not have been sufficient to grant FCA a license.  Bluetooth's more-than-eight-year delay is nearly triple the length of the applicable three-year statute of limitation period here.  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835-36 (9th Cir. 2002) (affirming district court's finding of unreasonable delay because the plaintiff's "seven-year delay [was] more than double the time available to file suit under the analogous limitations period").

Finally, the last factor (the extent of harm that FCA suffered because of Bluetooth's delay) greatly overlaps with the second prong of the laches analysis, prejudice, which is discussed in greater detail below.

Balancing all the *E-system* factors, the Court concludes that Bluetooth's lack of diligence is decisive and that Bluetooth's delay was not reasonable.

### iii. Whether FCA was prejudiced by Bluetooth's delay poses triable issues of fact

Even though Bluetooth's delay was unreasonable and laches presumptively applies, FCA must still establish that it was prejudiced by the delay.  *Jarrow*, 304 F.3d at 839-40.  In the laches context, there are two types of prejudice: expectations-based prejudice and evidentiary prejudice.  *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1119-20 (9th Cir. 2018).

Expectations-based prejudice exists if a defendant "took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly."  *Id.* (quoting *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1227 (9th Cir. 2012)).  A defendant can establish expectations-based prejudice by showing that it invested money to expand its business or entered transactions based on its presumed right

ORDER – 34

to use a mark. *Id.* It may also show that, "as a result of entering into such business transactions during the delay, it may incur liability for damages." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 1000 (9th Cir. 2006).

FCA argues that it has invested in "including Bluetooth in its vehicles for over 15 years while [Bluetooth] took no legal action." Dkt. # 189 at 14. But it cites no evidence in support. It has not specified how much money it has invested, the types of transactions it entered in reliance on Bluetooth's unreasonable delay, or any exposure to contractual damages caused by the delay. Thus, FCA has not proven expectations-based prejudice.

A defendant may also show that it suffered evidentiary prejudice because a plaintiff delayed in bringing suit. *Eat Right Foods*, 880 F.3d at 1120-21. Evidentiary prejudice exists if the delay has led to "lost, stale, or degraded evidence, or witnesses whose memories have faded, or who have died." *Id.* (quoting *Evergreen*, 697 F.3d at 1227).

FCA argues that the much of the evidence here has been lost and destroyed. Dkt. # 150 at 25. According to FCA, more than a dozen former FCA employees, each of whom possess highly relevant information of Bluetooth dealings, are now unavailable. Dkt. # 172 at 20. And the same it says is true for Bluetooth employees. Dkt. # 189 at 15. Further, FCA argues that vital third-party documents were destroyed. Dkt. # 150 at 14. In response, Bluetooth argues that FCA deposed most of the employees that it said were inaccessible and that FCA cannot be sure that the third-party documents were destroyed as they may have not existed in the first place. Dkt. # 156 at 25.

The resolution of whether FCA suffered evidentiary prejudice poses factual questions. The extent Bluetooth's delay resulted in the unavailability of witnesses, the destruction of documents, the fading of memories, and more are all issues unfit for resolution by summary judgment.

In sum, FCA has shown that laches presumptively applies and that Bluetooth's

ORDER – 35

delay in bringing this action was unreasonable.  But the issue of prejudice remains.[7]
Thus, the parties' motions for summary judgment on FCA's laches defense are **DENIED**.

### J.      Affirmative Defense—Acquiescence

Bluetooth finally moves for summary judgment on FCA's acquiescence defense.
Dkt. # 155 at 31.  While laches asks whether a plaintiff slept on its rights, the doctrine of
acquiescence asks whether a plaintiff conveyed implied consent.  *Eat Right Foods*, 880
F.3d at 1121.  To establish acquiescence, a defendant must show that "(1) the senior user
actively represented that it would not assert a right or a claim; (2) the delay between the
active representation and assertion of the right or claim was not excusable; and (3) the
delay caused the defendant undue prejudice."  *Seller Agency Council, Inc. v. Kennedy
Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010).  Although the
acquiescence analysis shares two elements with the laches analysis, there are important
distinctions.  *Eat Right Foods*, 880 F.3d at 1121.  In the acquiescence context, a
defendant must show that it relied on the senior user's affirmative act or deed and that
such reliance was reasonable.  *Id.*  A court must "examine both the content of the
affirmative act and the context in which that act was performed."  *Id.* (quoting *Seller
Agency*, 621 F.3d at 990).

FCA does not make it past part one of the test.  Despite claiming a long history of
communications and dealings with Bluetooth, FCA cites only one email to show
acquiescence.  Dkt. # 172 at 31.  In that email, Bluetooth told Chrysler that, as a
Bluetooth member, Chrysler could use the "Bluetooth Logo" for free.  Dkt. # 175-15 at
77.  As this is all that FCA cites, the Court struggles to determine "the context in which

---

[7]  The Court does not reach FCA's argument that laches, if proven, would bar monetary
recovery *and* prospective injunctive relief.  Although laches does not typically bar
prospective injunction relief, it is not an absolute rule.  *Pinkette Clothing, Inc. v.
Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1027 (9th Cir. 2018) (citing *Danjaq LLC v. Sony
Corp.*, 263 F.3d 942, 959 (9th Cir. 2001)).  The Court must weigh Bluetooth's delay
against its resulting prejudice to FCA to "determine whether and to what extent laches
bars the requested relief, including a request for an injunction."  *Id.*

th[e] act was performed." *Eat Right Foods*, 880 F.3d at 1121.  That said, based on the face of that e-mail and FCA's failure to cite any other affirmative representation, FCA's evidence is clearly insufficient.

First, the e-mail begins with a request from Chrysler to use the "Bluetooth Logo." Dkt. # 175-15 at 77.  It does not specify which logo exactly Chrysler is free to use, so the Court cannot determine whether Bluetooth's permission even applies to the marks here. Second, although Bluetooth says that it may use the Bluetooth logo, it does not specify for what purposes and does not explicitly authorize the use of the logo to promote FCA's vehicles.  Third, Bluetooth clearly states that it is granting a license under the assumption that Chrysler is a Bluetooth member, which FCA claims it never was.  Dkt. # 150 at 16 n.11.  Permitting FCA to use its dubious membership status as both sword and shield would be inequitable.  Finally, this statement does not imply that Bluetooth would not "assert a right or claim" in the future.  *Seller Agency*, 621 F.3d at 989; *see also United States v. Washington*, 88 F. Supp. 3d 1203, 1216 (W.D. Wash. 2015) (rejecting an acquiescence defense because the petitioner did not imply that it would not "assert [its] right to seek adjudication . . . through the proper channels in the future").  No reasonable trier of fact could determine that this email alone was an active representation that Bluetooth would not enforce its rights.

Given that FCA has the burden of proving acquiescence at trial, Bluetooth satisfied its summary judgment burden by showing that there is an absence of evidence, shifting the burden to FCA.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  As explained above, FCA has failed to set forth a genuine issue of fact for trial.  Thus, Bluetooth's motion for summary judgment on this defense is **GRANTED**.

### K.       Cancellation for Engaging in the Production or Marketing of Goods or Services to Which a Certification Mark Is Applied Under 15 U.S.C. § 1064(5)(B) (Counterclaim III)

FCA seeks cancellation of Bluetooth's certification marks.  Under 15 U.S.C.

§ 1064(5)(B), a certification mark is subject to cancellation at any time if a registrant "engages in the production or marketing of any goods or services to which the certification mark is applied." FCA argues that Bluetooth is doing that here.

FCA's theory proceeds as follows: Two of the Bluetooth Marks are certification marks, the BLUETOOTH word mark and the BLUETOOTH & B Design Mark ( **Bluetooth** ). Dkt. # 150 at 26-28. Certification marks and trademarks are incompatible because using both concurrently "would improperly compromise the objectivity of the certifier if it were competing in the market that it certified." *Id*. at 27 (citing 3 McCarthy § 19:94). Here, FCA argues that Bluetooth is using its certification marks as trademarks. For proof, FCA points to the specimens of use that Bluetooth submitted in support of its *trademark* registration. *Id.* In those specimens, some of the pictures depict products bearing the *certification marks*. *Id.* at 27-28; *see also* Dkt. # 158-8 at 3-37. Under penalty of perjury, Bluetooth declared that the certification marks depicted in the specimens were in use as trademarks. Dkt. # 150 at 27. FCA concludes that this is a violation of the plain text of 15 U.S.C. § 1064(5)(B)—Bluetooth has "engage[d] in the production or marketing of [] goods or services to which the certification mark is applied." *Id.* at 26-28.

This theory has no basis in the case law. Indeed, the Court has found almost no authority on the application of § 1064(5)(B). FCA cites one sentence of one case for support. In *Midwest Plastic Fabricators, Inc. v. Underwriters Labs. Inc.*, 906 F.2d 1568, 1571 (Fed. Cir. 1990), the Federal Circuit—on an appeal discussing a different subsection than the one FCA asserts here—explained that "if a certification mark's owner also allowed the mark to be used as a trademark, there would be a basis for cancellation of the registration." FCA says that Bluetooth "allowed the certification marks to be used as a trademark" here by allowing its licensees to use the certification marks as trademarks. Dkt. # 172 at 13.

FCA offers no context for this quote, so the Court must supply it. Certification

ORDER – 38

marks are "special creature[s]" and are distinct from ordinary trademarks because they certify quality of goods or services. 3 McCarthy § 19:91. Such marks certify that goods or services have been tested to meet certain standards, and consumers are "entitled to assume that that product or service in fact meets" those standards. *Id.* But certification mark owners cannot certify their own goods or services using their own certification marks. *Id.* § 19:94. If they were allowed to "compet[e] in the market that [they] certified," then that would "improperly compromise the objectivity of the certifier." *Id.* This is sometimes referred to as the "antiuse-by-owner rule." *Id.* Although the case law is slim, other authority holds that this rule is meant to prevent certification mark owners from certifying their *own* goods or services. *Id.* ("Consumers faced with the owner of a certification mark who uses the same designation as a trademark to *identify its own goods and services* . . . would be unable to distinguish the two different uses of the designation. A symbol is not used as a certification mark if it is used to certify the *owner's own products*. The Trademark Board has held that the Lanham Act reveals an intent *to preclude the owner of a certification mark from producing or selling goods or services* in connection with which the certification mark is used.") (emphasis added) (footnote omitted).

This is in step with *Midwest Plastic*. The sentence that FCA quotes is supported by two cases, both of which agree with the above. *In Re Fla. Citrus Comm'n*, 160 U.S.P.Q. (BNA) 495 (T.T.A.B. 1968) ("[T]he owner of a certification mark cannot use the identical mark as a service mark or a trademark on or in connection with *any goods or services that it markets or performs*.") (emphasis added); *Consolidated Dairy Prods. Co. v. Gildener & Schimmel Inc.*, 101 U.S.P.Q. 465, 467 (Dec. Comm'r Pat. 1954) ("*Petitioner itself* uses 'Darigold' in a trade mark sense and a blue diamond on which appears 'Seal of Darigold Guaranteed Quality' in a certification mark sense.") (emphasis added).

Because Bluetooth does not "engage[] in the production or marketing of any goods

ORDER – 39

1   or services," neither *Midwest Plastic* nor § 1064(5)(B) apply.  Bluetooth does not

2   produce, manufacture, or sell any of the certified goods to which its certification marks

3   are applied.  Dkt. # 156 at 28.  Put differently, Bluetooth is not certifying its own goods

4   or services because it does not have goods or services.  Thus, its objectivity in certifying

5   goods is not "improperly compromise[d]," and the antiuse-by-owner rule does not fit

6   here.  3 McCarthy § 19:94.

7          Bluetooth also clarifies the specimen of use issue.  Bluetooth explains that its

8   specimens of use do not depict Bluetooth's *own uses* of the trademark and certification

9   marks.  Dkt. # 156 at 28.  Rather, they show how the marks are being used by *licensees*.

10  *Id.*  No FCA authority suggests that licensees are beholden to the antiuse-by-owner rule,

11  as certification mark owners are.  *Id.* at 27.  As Bluetooth puts it, Bluetooth "members are

12  permitted to use the Certification Marks on *certified goods* but are also licensed to use the

13  B Design mark, and thus, the Certification Marks may appear on products for which the

14  B Design mark is also used."  *Id.* at 27 (emphasis in original) (citation omitted).  FCA

15  does not refute this, and the Court sees no reason to disagree with Bluetooth.

16         In sum, FCA asks the Court to cancel Bluetooth's certification marks under a

17  novel, unsupported theory.  The Court declines.  Bluetooth's motion for summary

18  judgment on FCA's third counterclaim is **GRANTED**, and FCA's motion on the same is

19  **DENIED**.

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  ORDER – 40

/ / /

/ / /

## V.   CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's Motion to Exclude the Expert Report and Testimony of Hal Poret (Dkt. # 59); **GRANTS in part and DENIES in part** Plaintiff's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment (Dkt. # 155); and **DENIES** Defendant's Motion to Dismiss on the Ground of *Forum Non Conveniens* and Motion for Summary Judgment or, in the Alternative, to Strike Jury Demand (Dkt. # 150).

DATED this 29th day of May, 2020.

The Honorable Richard A. Jones
United States District Judge

ORDER – 41